and Don Hunter, athletes plus accounts, by Thomas Jacobs. Mr. Jackson. Good morning, your honors. I'm Don Jackson and I will be representing the estate of Mrs. Springer. This case involves the valuation of a very small company owned by family members in Tulane, IL. It's called Trekon Inc. My client originally, Cynthia Springer, passed away in October of 2008. And there was in place at the time a purchase agreement to be followed for purchase of her stock. It was owned by four members, three members of the family and the vice president of operations of Trekon. The dispute comes over the proper way to evaluate the stock. The agreement required that the valuation be prepared by the accountant for the company initially. That didn't happen in this case. In fact, the first evaluation was prepared by Steve Gunther, who was one of the family members that owned the company. His valuation amounted to $100,000, $25,000 per 120 shares of stock. The second attempt at this came three years later when the company had its corporate accountant do an evaluation and he fared no better. He valued the company at $300,000 by virtue of allegedly following the procedure outlined in the purchase agreement. The court disregarded both of those evaluations. Our expert, in fact, prepared an evaluation that used common accounting principles, gap of principles as they're called, general accounting procedures in not only normalizing certain expenses that according to accounting procedures should have been normalized, the salaries, compensation paid to the officers, the rent, the lease, and then deducting, of course, any contracts or expenses that the company owed to other vendors. That last calculation in the motion for your hearing was new evidence, wasn't it? Pardon me? That was different evidence, wasn't it, when they did the last evaluation? That's not what was presented at trial. No. Actually, the judge disallowed the normalization of those items, basically saying that our expert was not qualified to make those evaluations, notwithstanding the fact that even the company's accountant said according to the gap principles that they were supposed to be normalized. So he recalculated the items. When the last evaluation, wasn't that different from what was presented by your client at trial? Yes, and that came about as a result of the other two last evaluations. That came about as a result of the court disallowing the normalizations of those expenses, the compensation to officers, the lease. In other words, at the re-hearing, you changed the evidence. Well, we were forced to change the evidence, Your Honor, because the judge disallowed the normalization items that were in our first presentation. I understand that. It's like you go to trial, you have the trial, and you present your evidence. And then you present, so that didn't work, and so now you're presenting new evidence. Well, the court asked us to recalculate without the normalizations, and that's what we did. That's what our expert did. He recalculated, leaving out the compensation for the officers and the actual compensation. He put the payments of the lease at the actual payment of the lease. And the one difference was the question of contracts that they owed. There was one contract. They had agreed to pay one of the officers some additional money, and the court disallowed that because that was really a payment to a stockholder from other stockholders. And so the court decided that that was not part of the debt. But in the recalculation, that's where the problem came in. The recalculation by our expert valued the company at $1,080,000, and if you divide that by four, the value of the Springer Estate stock would have been $270,000. Instead, the company used a demonstrative exhibit that came in at the last minute. It actually came in during rebuttal. That really didn't explain what figures or how he came to the figures, but the court used his demonstrative exhibit as the basis of valuing the stock and consequently came out to $172,000, which actually shorted, in my judgment, the Springer Estate by almost $100,000. And so the purpose of our appeal today is to try to get that error, what we perceive to be an error in the record, corrected, and to get a proper valuation of the value of the Springer Estate stock. This exhibit came in at the last moment. In fact, my recollection is we had taken a break and the other side brought it in, and with the exception of not allowing the debt that the other stockholders had created to pay one of the other stockholders, the court only allowed $35,000 deductible for debts. And then extrapolated that into the $172,000 value. We think that the court improperly used the wrong exhibit in making that calculation, and that's why we're here to appeal. Any questions? Thank you. Thank you, Mr. Jenkins. Mr. Davies? Good morning. I think, as the court knows, there's two basic issues here. One, which Mr. Jackson addressed, which is the valuation by the trial court of the stock. The second, which is the part of our appeal, which is whether or not it was proper to introduce evidence. I would like to follow up on what Justice Carter, the questions he asked, which is precisely my objection to the appeal. He doesn't argue whether or not the finding of the trial court was against the manifest weight of the evidence. What he said, and he admitted, is, well, we had to go back and recalculate what we did. Well, that's another fancy word for Mr. Gerber, the estate's expert, changed his whole methodology. If you look at what the trial court said on page, I believe it's 826, I think its reasoning was very clear, and its reasoning was in conformity with exhibit B to the stock purchase agreement, which set forth the methodology. You go through a normalization process. What I don't think the estate understands is their expert, and actually they admit in their brief and in their motion to reconsider, they admit the trial court was proper to exclude any adjustment or normalization for rent. They admit that the trial court was proper to exclude any normalization for salaries. So those aren't even issues. If you compare the testimony or the evidence of Mr. Gerber in his initial opinion, and that of what's called exhibit B in his post-trial, he contradicts himself for one thing. He's got a third figure that he throws in there. And most importantly, if you look at his initial report and compare that to his exhibit B, in his initial report he had no adjustment for what he set forth in exhibit B regarding the salary adjustment. It's a completely new theory. It's completely new evidence. Even under the rules of discovery, he wouldn't have been able to do that at trial. You can't change your opinion before trial, much less after it. I think the legal principles are pretty clear. I think there's no question that you cannot do that. There's only three ways you can proceed under 1203. That's if there's new evidence not available at trial, if there was a change in the law, or if for some reason the trial court improperly applied the law, and you can demonstrate that. None of those facts exist in this case. In fact, if you look at the trial court's analysis and this exhibit 17 demonstrative, it's not evidence. All it was was a recitation and analysis of the facts that were presented at trial to support my argument. The trial court really didn't agree with me. The trial court took Mr. Gerber's analysis, disallowed the two adjustments for rent and salary because there was no basis for it, rejected my argument that the note for 317,000 should be subtracted, which I argued for. We lost. We're not appealing that. So we followed exactly the evidence, the trial court applied it, and the formula was used. So we asked that the award of the 172, 717 be affirmed. The second issue is the contract interpretation, and that's the basis of our appeal and request that the awarding of the interest be reversed. It's a pure legal question. It's the standard, I believe, is de novo. What are we looking at? We're looking at a basic stock purchase agreement that provided if somebody dies, the company has the right to buy it. That's what happened. The company made an offer. It was rejected. The second major provision in the agreement provided for how do you pay for the stock? You do it one of two ways. You either pay cash, or if you can't pay cash, then the financing comes in. You have three years. You can finance it up to three years and then pay interest. But you pay interest only because you're not paying cash. What doesn't the agreement cover? Unfortunately, it doesn't cover this situation. It does not provide, well, what happens if you don't close within 180 days? Obviously, if there had been a provision in there, we probably wouldn't be arguing that, because that provision would have covered this. We submit that since it was not in the contract, it's not within the prerogative of this court to read that in there and say, well, we're going to add interest from some point to whenever it's paid. What about Section 2.3? Dealing with interest at the rate of two and one-half percent over the local prime rate in effect at the company's bank at the date of death to the closing. It shall be paid. Yes, I believe that section was intended and states it's paid. It's in the context of payment from date of death up to closing. But it does not say after closing. I think that's a leap beyond, and I think we all agree, look at the four corners of the agreement, I think that's a leap beyond what the parties intended. I mean, there's one phrase, but it's payment in no event later than six months after the death of the shareholder. Correct. And unfortunately in this case, payment could not be made because the parties were, as I think the court can see, considerably far apart on the value. And that is sort of a side point is that I think in any contract, the law states parties are presumed to act in good faith. I would suggest that the estate spends plenty of time attacking the $75,000 offer that's based on a lot more reason than their demand of $1,050,000, which was based on two factors that have nothing to do with anything. One, they wanted a $750,000 life insurance. The agreement clearly states in at least two places it doesn't apply. And secondly, they wanted $300,000. They pulled out of thin air just to settle it. They've never offered any explanation or rationale for that. So I would suggest based on that, it was obviously futile, and that's why I wouldn't be here today, but why the matter was never resolved. So we request that the award of the $34,000 plus interest be reversed or at the minimum allow only interest for six months as contemplated by the agreement, which I think I calculated to be about $5,962. Because the agreement was to close within six months of death, is that right? Correct. I have a question about this formula, which was the normalized pre-tax income to be determined. Is that the same concept as later on in that paragraph, the determination of the normalized pre-tax cash flow? Do you interpret those to be one and the same? As the actual? Yeah. The normalized pre-tax income, okay, and you talk about how you normalize that. And then in that same paragraph, the determination of the normalized pre-tax cash flow shall be made by the company's accountant. Are those two separate distinct concepts? No, I don't think so. You're just the... No, I'm asking about the definition. You've got two different terms in that paragraph. Well, I think there by the exhibit shows how they're intended to be by the examples given in the exhibit B as to what can be adjusted. So there is a difference between pre-tax income and pre-tax cash flow? Well, there would be because cash flow and income aren't necessarily always the same. Well, that's a long way of saying you're answering my first question. They're different concepts, right? Yes. Okay. So what is the interest based on the evaluation of the interest on pre-tax income or pre-tax cash flow? I think pre-tax income with those adjustments which turns it into cash flow because you take out depreciation. Some items are not cash flow and some are. Yeah, depreciation isn't. Right. So what is it you take out to get a cash flow? I think you take out what's shown on the exhibit. For instance, depreciation, interest, life insurance doesn't apply. None of those other items apply. I think EBITDA is typically earnings before interest, tax, and depreciation. I don't think we disagree with how we arrive at that. I don't think the estate and I disagree with that. What we're disagreeing with is what adjustments are made, and actually we're not disagreeing with what the trial court came up with, although we argued differently based on accrual. The trial court rejected that, and I'm not prepared. I don't feel that was worth arguing because in hindsight I think the trial court properly applied that. Okay. Let me just ask you one question about the interest, and that is if this thing goes on, would one way to stop that? I mean, you know, it's not like a contested word. They say you own something, you say we owe you nothing. So you knew you owed the estate something, correct? Correct. Would an interpleader stop the interest? Would that be one way at least to stop interest from running? I suppose. I mean, actually we're the ones that there was the oppression suit filed, and we're the ones who filed the counterclaim wanting to pay the stock. I never honestly just as ever thought of that. Obviously we would have if we did. That would be an argument you could make now, but we would have only put in $75,000. I honestly didn't think of that. I'm not even sure it's the right unit, but it is. Well, it would have been something, but short of waiting and getting it resolved in trial, there really wasn't any way the parties could even get close. So is there really a dispute about general accounting principles here? I don't think so. It's just the normalization and the fact that through their motion to reconsider, they tried to change their theory and came up with a different deduction, or addition actually, that they didn't have enough evidence presented at trial. So no, I don't think we really disagree with that. The court rejected our expert's argument on the accrual, which allowed us to argue whether you should take more off. It's kind of sad when you have agreements that are supposed to avoid all of this, that you end up in litigation for years, isn't it? Yes. Well, I can say that this agreement has been used many times without a problem that will be modified in the future to cover this point. Okay. Well said. Okay. Anything further? Thank you. All right. Thank you, Mr. Davies. Mr. Jackson. Here I am. I don't think that we changed our opinion in this case. We still believe that the very first professional opinion that we rendered in this case is the correct one. But it was clear the judge was not going to let us pursue that matter. And so he wanted us to revise the figures of the case, in essence, ignoring general accounting practices. And so that's what we did. That's where we got Exhibit B from. But in all actuality, the estate obviously comes out better with respect to when we follow the general accounting practices and made the proper calculations in accordance with those practices. But the court felt that our expert, who had 20 years' experience in doing valuations for high-note bandwork, was not qualified to give the opinions that he gave with respect to the compensation and with respect to the lease payments. And so we were left with no choice but to try to accommodate the court and give him figures based on what he wanted to see in the record. So at any rate, I don't think we changed our position. With respect to the interest, I think the – well, first of all, it seems to me that Mr. Davies wants to apply the contract or the stock purchase agreement when it fits his purpose and not do it otherwise. I mean, the original – the agreement required that this be done. He talks about no interest after six months. But they didn't present anything in accordance with the agreement within six months. It was three years before their accountant even presented the $75,000 offer, which was woefully inadequate in this case. They, in essence, wanted the client to believe that this business was only worth $300,000. Not one of them would sell their shares of stock for that kind of money, and they knew that. So the contract clearly requires interest from the date of death until it's closed. And that's the only – that's the period of time that the court allowed interest payments to accrue, and we stopped them after that. So I think the interest was properly calculated, 2.5% over the prime at the business's bank, and that's what the court applied in this case. So I don't see – you don't see an argument about the interest being – there's nothing in the contract that says the interest should only run for six months. Absolutely nothing but a theory that says, well, we were supposed to get this done in six months, but they didn't present their accountant's valuation until three years after the death of Mrs. Springer. So I don't see any argument there at all. We'd ask the court to affirm the interest that the court allowed in this case. Thank you. Any questions? I'm sorry. No, thank you, Mr. Jackson. Thank you. Mr. Davies of Rebuttal. The only comment I would add is Mr. Jackson says there's nothing in the contract that says interest stops. Well, there's nothing in the contract that says it goes beyond the six months. It works both ways. The contract was deficient in that regard in that it did not contemplate this situation. Either way. All right. Thank you. Thank you. All right. Thank you both for your arguments here this morning. This matter was taken under advisement and a written disposition will be issued. Right now we'll be in a brief recess for a panel change before the next case.